```
 1              IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   IN RE:                      )  No. 13 B 10766
                                 )  Chapter 13
 4   JAVIER AND ELISA DIAZ,      )  February 1, 2019
                                 )  10:00 a.m.
 5          Debtor.              )

 6          TRANSCRIPT OF THE PROCEEDINGS
          BEFORE THE HONORABLE JANET S. BAER
 7
     APPEARANCES:
 8
          OFFICE OF THE CHAPTER 13 TRUSTEE,
 9        MR. GLENN B. STEARNS
          BY MS. CAROLYN A. SUZZI,
10        801 Warrenville Road, Suite 650
          Lisle, IL  60532-4350
11        630-981-3888

12            appeared on behalf of the Chapter 13
              Trustee, Glenn B. Stearns;
13

14        COSTELLO & COSTELLO
          BY MR. STEPHEN J. COSTELLO,
15        600 Spring Hill Ring Road, Suite 116
          West Dundee, IL  60118
16        847-428-4544

17            appeared on behalf of the debtors;

18
          McCALLA, RAYMER, PIERCE LLC
19        BY MS. DANA N. O'BRIEN,
          1 N. Dearborn, Suite 1200
20        Chicago, IL  60602
          312-346-9088
21
              appeared on behalf of Faye Servicing.
22

23   REPORTER:
        Susan G. Bloom, CSR
24      7757 Somerset Drive
        Marengo, Illinois 60152
25      815-923-4104
```

```
 1                    (Whereupon, the following
 2                     proceedings were had
 3                     before Court and counsel
 4                     in open court:)
 5         THE CLERK:  Line 221, Diaz.
 6         MS. O'BRIEN:  Dana O'Brien for Faye
 7   Servicing.
 8         MR. COSTELLO:  Steve Costello for the
 9   debtors.
10         THE COURT:  Good morning.  This matter is
11   fully briefed, and I do have a written ruling.
12              The matter's here before the Court on
13   the Debtors' Motion to Determine Final Cure and
14   Payment under Rule 3002.1.  The Court has reviewed
15   the various responses and replies to the Debtors'
16   Motion, the various exhibits to those documents, the
17   Court docket in the case, the confirmed Chapter 13
18   plan, and Wells Fargo's Proof of Claim.  Generally,
19   the facts are not disputed in this matter, but the
20   outcome of the matter is highly contested.  The
21   pertinent facts are as follows:
22              Debtors commenced their Chapter 13 case
23   on March 18th, 2013.  On May 9th, 2013, Wells Fargo,
24   the holder of the first mortgage on the debtors'
25   residence at the time of filing, filed a proof of
```

 1  claim in the amount of $105,634.19, which included

 2  pre-petition mortgage arrears in the amount

 3  $18,922.20.  The Court notes that the parties in

 4  their briefs refer to the arrears claim as being in

 5  the amount of 18,992.20.  The Court has reviewed the

 6  claim and verified that the amount listed in the

 7  proof of claim and in the debtors' confirmed plan is

 8  18,922.20.

 9             On May 16, 2013, the Court confirmed the

10  debtors' modified Chapter 13 plan.  The plan provided

11  that the debtors would remit post-petition mortgage

12  payments directly to Wells Fargo.  The plan further

13  provided that the debtors would pay the $628 per

14  month for 60 months for a total payment during the

15  plan term of $37,680.  The plan also provided that

16  the debtors would cure the mortgage arrears owed to

17  Wells Fargo in the amount of 18,922.20 by paying such

18  arrears over the life of the plan and that the

19  nonpriority unsecured creditors would receive an

20  11 percent dividend.  The debtors made every payment

21  required of them under the 60-month plan and also

22  made all post-petition mortgage payments directly to

23  whomever held the mortgage or its servicing agent.

24             On September 12, 2013, Wells Fargo sent

25  a letter to the Chapter 13 trustee which indicated

1  that the debtors' loan to Wells Fargo, quote, had
2  been paid in full, that the trustee should, quote,
3  not forward any additional payments on this loan and
4  that, quote, any additional funds received would be
5  returned, end quote, to the trustee's office.  The
6  Wells Fargo paid-in-full letter was not filed with
7  the Court.  No proof was offered by any party with
8  respect to who received the letter other than the
9  trustee.  The trustee has indicated that upon receipt
10 of that letter, the trustee stopped paying the
11 arrears claims.  At that time, the trustee had only
12 made one arrears payment to Wells Fargo in the amount
13 of $270.48.
14           The trustee alleges several further
15 facts that no one challenges.  Specifically, that on
16 October 11, 2013, the trustee began disbursing
17 payments to the debtors' general unsecured creditors
18 because the trustee determined that funds were now
19 available for such disbursement due to the payments
20 to Wells Fargo having been stopped because of the
21 paid-in-full letter.
22           On October 14th, 2014, the trustee
23 completed an audit of the case and adjusted the
24 percentage due to the unsecured creditors to
25 58.47047 percent for the confirmed 60-month plan base

```
 1   of $37,680.
 2              On October 24th, 2014, a Dividend
 3   Adjustment Notice was sent by the trustee to the
 4   debtors and the debtors' attorney which disclosed the
 5   following information:  The 60-month plan base of
 6   37,680; the total paid into the plan by the debtors
 7   at that time of $11,176; the plan base balance of
 8   26,504; and, the estimated percent to unsecured
 9   creditors of 58.4703 percent.
10              Every six months beginning November,
11   2014, the trustee sent periodic reports to the
12   debtors and their attorney.  The Court has not been
13   provided a copy of any of these reports, but the
14   trustee indicated that the reports showed that no
15   money was being sent to any lender for the arrears.
16              On November 27, 2013, a Notice of
17   Transfer of Mortgage Claim was filed, indicating a
18   transfer of the Wells Fargo claim to Citibank, N.A.
19   On May 12th, 2014, a Transfer of Claim Other than For
20   Security was filed, further transferring the claim to
21   Wilmington Savings Fund Society.  On September 8th,
22   2016, a Transfer of Claim Other than For Security was
23   filed, indicating a further transfer of the claim to
24   Faye Servicing LLC.  Upon receipt of each of the
25   notices of claims transfers, the Court sent a Notice
```

to Assignor of Filing of Assignment/Transfer of Claim, advising of receipt of the assignment and the date for objection. No objections were filed with respect to any of the claims transfers.

Upon completion of the debtors' final payments under the plan and pursuant to Bankruptcy Rule 3002.1, on July 20th, 2018, the Chapter 13 trustee issued a notice of cure of the mortgage. On August 10th, 2018, Wilmington filed a Response to Notice of Final Cure Payment wherein they acknowledged that debtors were current with all post-petition payments on the mortgage, but that the pre-petition arrears had not been paid in full and that $18,651.72 of those arrears remained unpaid.

Based on these essentially uncontested facts, the debtors, the trustee and the lender are all pointing fingers at each other regarding who is responsible for money being paid to the wrong creditors and not to the lender on the arrears claim. All but $270.48 of the $18,922.20 of the funds the debtors paid pursuant to their confirmed plan for arrears, were essentially redistributed and paid to the debtors other general unsecured creditors. In fact, the debtors in their reply filed on January 25th, 2019, have prepared a chart on Page 6 that list

the debtors' other unsecured creditors and the amounts that should have paid been pursuant to the plan to each of the creditors versus the higher amounts that were actually paid to these unsecured creditors because of the, quote, redistribution of monies.

Further, as pointed out by the debtors, the debtors had stripped off a second mortgage in favor of First Third Bank.  That claim was for $37,440.77, and after the strip off became the largest unsecured claim in the case.  As a result of the strip off, Fifth Third Bank should only have received a dividend of about $7,230.  However, due to the redistribution of the arrears' funds, Fifth Third was actually paid $20,844.54, an overpayment of sorts of $13,614.39.  The debtors' chart shows the calculation for the resulting redistribution of the arrears money to the debtors' other unsecured creditors as well.

In their briefs, each of the parties in interest make arguments regarding why the other parties in interest are responsible for the debtors' arrears payments going to the wrong creditors.  And, in reviewing those briefs, the Court had concluded that the only one party who is not responsible for

1  the error is the debtors.  They made every payment
2  they were required to make under the plan to the
3  trustee for five years, and they cannot be held
4  responsible for the lender's remaining unpaid
5  pre-petition arrears.
6           On the other hand, the trustee, the
7  lender, and the debtors' counsel all share some
8  responsibility for what happened in this case.  As a
9  result, all three of those parties will be
10 responsible for trying to fix the situation while the
11 debtors will be deemed to have fully cured the
12 arrears.
13          The responsibility for the errors in
14 this case starts with the lender.  The current lender
15 is Wilmington Savings Fund Society and the servicer
16 is Faye Servicing LLC.  Wilmington and Faye are
17 holders of the claim as a result of the transfer from
18 Citibank who received the claim by transfer from
19 Wells Fargo, and Wells Fargo is the only entity
20 responsible -- and Wells Fargo is the entity
21 responsible for creating this mess in the first
22 place.  The Wells Fargo paid-in-full letter of
23 September 12, 2013, is unequivocal.  It states that
24 Wells Fargo has been paid in full, and that the
25 trustee should not forward any additional payments on

1  the loan, and then any additional funds received will
2  be returned to the trustee's office.  We all may know
3  now that what really happened is Wells Fargo got paid
4  off by selling the claim to Citibank, and that the
5  debtors' obligation had not changed.
6           But that is not what the paid-in-full
7  letter said.  No one should have to presume or guess
8  the circumstances under which the letter was sent.
9  It says the loan was paid in full.  Wilmington/Faye
10 is the successor purchaser of the claim, a claim on
11 which Wells Fargo was so lazy and sloppy that one
12 could argue that it was no claim that they
13 subsequently assigned to the lender, and the lender
14 took assignment of a paid-off claim.
15          On the other hand, we know that no one
16 ever moved to disallow the claim, the claim was
17 transferred three times without objection, and no one
18 ever moved to amend the plan.  Further, no one on
19 behalf of the lender ever complained that the arrears
20 were not being paid until the Final Notice of Cure
21 was sent at the end of the 60-month plan and over
22 four years after payments on the arrears claim to the
23 lenders had ceased.
24          Now, what was the trustee supposed to do
25 in these circumstances?  As the lender alleges,

1  trustee's duty was to make the payments to creditors
2  that were required by the confirmed plan.  Among the
3  payments the plan provided for was a payment in full
4  to Wells Fargo of the arrears claim.  Four months
5  into the plan, the trustee received a letter from
6  Wells Fargo saying it had been paid in full on the
7  claim, the trustee should not send Wells Fargo any
8  more money, and if the trustee did, Wells Fargo would
9  return the payments to the trustee.  Upon receipt of
10 that letter, it was not unreasonable for the trustee
11 to stop paying Wells Fargo.  After all, that is what
12 Wells Fargo said to do.  Plus, we must keep in mind,
13 the debtors are paying their ongoing post-petition
14 mortgage arrears directly to the lender.  The trustee
15 is not involved in that process and has no knowledge
16 for responsibility for those payments.  So, again,
17 what's the trustee supposed to do?
18             The trustee argues that it routinely
19 receives paid-in-full notices from creditors.  The
20 trustee further states that, most of the time, the
21 creditor does not amend or withdraw its claim or take
22 any action with the Court.  And since the notices are
23 contrary to the creditors' interest, the trustee
24 takes these notice at face value, relies on them, and
25 stops paying on the claims at issue.  This is the

1  trustee's customary practice.  The trustee goes on to
2  argue that in 19 years as a trustee, this is the only
3  instance in which the trustee has received a
4  paid-in-full letter where the trustee subsequently
5  learned that the mortgage company had not been paid
6  in full.  The trustee concludes that, quote, any
7  reasonable person would have assumed, as the
8  trustee's office did, that there was a loan
9  modification, and these mortgages arrears had been
10 paid in full, end of quote.
11            The trustee, however, cites no case law,
12 code section, or even trustee operating guidelines
13 that confirm that the customary actions taken by the
14 trustee were the correct actions to take.  And as the
15 lender points out, the trustee had a duty under code
16 section 704(a)(5) to examine proofs of claim and
17 object to the allowance of improper claims.  But
18 here, once the trustee received the paid-in-full
19 letter, it knew that the lender's claim was not
20 proper, yet the trustee took no action to object to
21 the claim.
22            Second, the paid-in-full letter was not
23 filed with the Court and is contrary to the three
24 subsequent Transfers of Claims, yet the trustee took
25 no action regarding the claim or the transfers of the

1  claim.

2  Third, the plan called for the trustee
3  to pay the arrears and the lender's claim was not
4  withdrawn or modified, yet the trustee stopped paying
5  on the arrears claim, violating the terms of the
6  confirmed plan.

7  Fourth, if the trustee believed that it
8  was appropriate to stop paying on the lender's claim,
9  the trustee should have moved to modify the plan to
10 remove debtors' obligation to pay on the claim.  As a
11 result, the lender argues that the trustee by
12 unilaterally stopping payment on the claim and
13 redistributing the arrears payments to the other
14 unsecured creditors, essentially without notice and
15 court order, both improperly disallowed the claim and
16 modified the plan.

17 On the other hand, the trustee alleges
18 that a year after receipt of the paid-in-full letter
19 and stoppage of arrears payment, the trustee sent
20 notice to the debtors and debtors' counsel disclosing
21 the 60-month plan base amount of 37,680, the total
22 paid into the plan by the debtors at that time of
23 11,176, the plan base balance of 26,504, and the
24 estimated percent to unsecured creditors of
25 58.4703 percent [sic].  The trustee further alleges

1  that every six months thereafter, the trustee sent
2  reports to the debtors and their attorney outlining
3  the updated status of the plan payments.  At no time
4  between stoppage of the payment of the arrears and
5  receipt of the Notice of Final Cure five years later,
6  did the debtor or debtors' counsel ever reach out to
7  the trustee or any other interested party to inquire
8  why the plan percentage to unsecured creditors had
9  changed from 11 percent to 58 percent.  And, at no
10 time between the stoppage of the payment of the
11 arrears and the receipt of the Notice of Final Cure
12 did the lender ever reach out to the trustee or any
13 interested paper to inquire why they have not
14 received any payment on the arrears.
15          Thus, the Court finds that there is
16 plenty of sloppiness and blame to go around in this
17 case.  Fortunately, however, there may be a somewhat
18 simple solution that may result in recovery of most
19 of the monies that the debtors paid for arrears that
20 went elsewhere.  As indicated in the debtors'
21 January 15, 2019, reply at Page 10, the arrears
22 payments were redistributed in error to the debtors'
23 seven unsecured creditors, and most of those
24 unsecured creditors are financial lenders of some
25 sort.  Creditors, who, by the way, never brought to

1 the attention of the trustee that they were receiving
2 far in excess of what the plan called for in terms of
3 distributions.
4 Given the type of unsecured creditors in
5 this case, it should not be a difficult task to seek
6 return of the overpayments. Therefore, the Court
7 will direct the trustee, with the cooperation of the
8 debtors, debtors' counsel, and the lender and
9 lender's counsel to immediately commence the
10 appropriate action to seek recovery of the monies
11 paid the debtors into the plan that the trustee
12 distributed to the unsecured creditors as a result of
13 the trustee ceasing payments on the arrears.
14 For the forgoing reasons, the Court will
15 order the following:
16 Number One, the debtors' Motion to
17 Determine Final Cure and Payment regarding Rule
18 3002-1 is granted, and the Court determines that the
19 mortgage on the debtors' residence, represented by a
20 claim filed in this case by Wells Fargo Bank as claim
21 4-1, which claim is now held by and/or serviced by
22 Wilmington Saving Fund Society or Faye Servicing LLC,
23 be and is hereby determined to be fully cured and
24 current in all payments due as of this date. The
25 Court is entering a separate order today that

1 provides for this relief; and

2 Two, the trustee, with the help and
3 cooperation of the debtors, debtors' counsel, lender
4 and lender's counsel, is ordered to immediately take
5 appropriate action to recover the payments that the
6 trustee made to the debtors' unsecured creditors in
7 excess of the 11 percent dividend called for in the
8 confirmed plan and turnover to the lender any of the
9 sums recovered from such unsecured creditors.  The
10 trustee must prepare and submit a draft order to the
11 Court that reflects the ruling of the Court on this
12 point and provides for the exact amounts the trustee
13 is seeking to recover from each unsecured creditor.
14 That draft order should be circulated to counsel for
15 the debtors and counsel for the lenders for their
16 comments and agreement prior to submission to the
17 Court.  The final order is due to be submitted to the
18 Court no later than February 15th, 2019;

19 Third, the trustee's draft order should
20 also reflect that this case is set for further status
21 on June 21st, 2019, at 10:00 at which time the Court
22 will expect a report from the trustee regarding the
23 trustee's recovery efforts.

24 We will enter the separate order with
25 respect to the debtors having paid off the mortgage,

1 and we will look for that draft order from the
2 parties with respect to whatever you need to tell
3 other unsecured creditors to pay the money back.
4       Okay. Thank you.
5   MR. COSTELLO: Thank you.
6   MS. O'BRIEN: Thank you, Your Honor.
7         (Which were all the proceedings
8          had in the above-entitled cause
9          on the day and date aforesaid.)
10
11   I hereby certify that the foregoing is a correct
12 transcript from the record of proceedings in the
13 above-entitled matter.
14
15
16               _____
                 Susan G. Bloom, CSR
17                  No. 084-001546
18
19
20
21
22
23
24
25